IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| VINCENT MILES, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 3:18-CV-00254-MAB |
| | ) |
| VENERIO SANTOS, M.D., EMILY | ) |
| BREWER, and LISA KREBS, | ) |
| | ) |
| Defendants. | ) |

# MEMORANDUM AND ORDER

**BEATTY, Magistrate Judge:**

Pending before the Court is a Motion for Summary Judgment (Doc. 77) filed by Defendant Venerio Santos, M.D. ("Santos") and a Motion for Summary Judgment (Doc. 82) filed by Defendants Emily Brewer ("Brewer") and Lisa Krebs ("Krebs"). For the reasons set forth below, the Court grants the motions and dismisses this action with prejudice.

### FACTUAL AND PROCEDURAL BACKGROUND

This action stems from medical treatment given to Plaintiff Vincent Miles ("Miles") by Defendants while Miles was an inmate incarcerated at Centralia Correctional Center, a facility operated by the Illinois Department of Corrections ("IDOC"). Miles was diagnosed as early as 2015 with degenerative joint disease ("DJD"), a condition that caused pain and discomfort (Doc. 110-2 at 2). Miles was also diagnosed with chronic Hepatitis B, a condition that can result in decreased liver function (Doc. 110-2 at 1).

In order to address Miles's complaints of pain in 2014, medical professionals at Western Illinois Correctional Center, an IDOC facility, prescribed doses of Ultram taken three times a day for six months (*Id.* at 23-24). Ultram is an opioid and a narcotic-like pain reliever. In 2015 at Pinckneyville, another IDOC facility, medical professionals prescribed 50 mg doses of Indocin taken 1-2 times daily over a period of approximately four months to treat Miles's DJD pain (*Id.* at 3). Indocin is a non-steroidal anti-inflammatory drug ("NSAID") (Doc. 110-3 at 1).

Miles was transferred to Centralia at some point prior to April 2016. In that month, he was first seen by Santos (Doc. 110-2 at 7). At that time, and at all times relevant to this action, Santos was employed as medical director of the health care unit at Centralia (Doc. 56 at 1).

On May 19, 2016, Miles was seen by Santos, who noted his diagnosis of DJD and prescribed 375 mg doses of Naproxen, to be taken as needed (Doc. 78-2 at 20). Miles again saw Santos on June 21, 2016, again complaining of pain related to DJD, and Santos increased his prescription to 500 mg of Naproxen (*Id.* at 23). Miles saw Santos again on July 21, 2016, again indicating that he continued to suffer from pain stemming from his DJD, which was unalleviated by the medications prescribed by Santos to date, and Santos then changed his prescription to 600 mg of Motrin (*Id.* at 34). On August 2, 2016, Miles saw Santos and again complained of DJD pain, and Santos increased his prescription to 7.5 mg of Mobic, an NSAID (*Id.* at 34). On August 26, 2016, Miles again complained that his medication was ineffective in addressing his pain, and Santos again increased his medication to 15 mg of Mobic (*Id.* at 37). On September 27, 2016, Miles again complained

that his medication was ineffective, but Santos declined to increase it further, noting the risk of damage to his liver, particularly in conjunction with his ongoing Hepatitis B (Doc. 78-1 at 124, 129; Doc. 78-2 at 41). Miles acknowledged that he had been taking his medication "excessively" every day and had run out of his prescription early (Doc. 78-1 at 124-25).

On October 29, 2016, Miles saw Dr. Arnel Garcia ("Garcia"), a different medical professional employed at Centralia. In response to Miles's complaints, Garcia changed his medication to 600 mg of Motrin and 750 mg of Robaxin, and at Miles's request he further provided a non-prescription analgesic balm, commonly known as Ben-Gay, which could be purchased by inmates from the prison commissary (Doc. 78-1 at 130-32, 175-78). On November 23, 2016, Miles again saw Garcia. Miles indicated that his medication was working at that time and requested a renewal of the Motrin and Robaxin (*Id.* at 132-33; Doc. 78-2 at 47).

On December 27, 2016, Miles saw Santos again. On this occasion, Santos renewed the Robaxin and Motrin that had been prescribed by Garcia but lowered the duration of the Robaxin prescription from 30 to 10 days, noting the potential for kidney damage from long-term use (Doc. 78-1 at 139-143). Santos saw Miles on several more occasions between December 2016 and April 2017, continuing to prescribe Robaxin and Motrin but giving quantities of Robaxin smaller than the 30-day supply provided by Garcia (Doc. 78-2 at 57, 69, 72, 75). Miles indicates that Santos did not provide him with more Ben-Gay, indicating that Miles could buy more from the commissary (Doc. 110-1 at 7-8).

On June 28, 2017, Garcia saw Miles again and renewed his prescriptions for Motrin and Robaxin, providing a three-month prescription of Motrin and two weeks of Robaxin, as Santos had been prescribing it (Doc. 78-1 at 167). Garcia also provided Miles with a three-month prescription for Ben-Gay (*Id.*).

Santos again saw Miles on a number of occasions between September 2017 and March 2018, renewing his prescriptions for Motrin and Robaxin and providing tubes of Ben-Gay (Doc. 78-1 at 171-174; Doc. 78-2 at 82, 88, 98).

At all times relevant to the action, Krebs was employed by IDOC as the Health Care Unit Administrator at Centralia (Doc. 57 at 3). On May 24, 2016, Krebs responded to a letter from Miles regarding his medical treatment and copays (Doc. 78-1 at 219-223). In his letter, Miles complained that he had previously been treated in the general medical clinic at other IDOC facilities and wished to also be treated in the general medical clinic at Centralia (*Id.*). Krebs reviewed Miles's medical records and responded, noting that the decision regarding general medical clinic placement was up to Santos (*Id.*). The main difference with placement in the clinic as opposed to his current treatment at Centralia was that without clinic placement, Miles was required to pay a copay (*Id.*). In June 2016, a counselor approached Krebs regarding a grievance filed by Miles. Krebs responded and explained that Miles was being treated by a doctor at Centralia and that she could not vary the treatment or refer Miles to a different physician (Doc. 83-2 at ¶6). In September 2016, Krebs received another letter from Miles with further questions about clinic placement and medication and reiterated that both clinic placement and medication were

subject to doctor discretion and that Miles was currently being treated by Santos (*Id.* at ¶6).

At all times relevant to the action, Brewer was employed by IDOC as a nurse at Centralia (Doc. 66 at 3). On May 13, 2016, Brewer treated Miles for DJD pain, providing him with ibuprofen (Doc. 83-3 at 14). Brewer saw Miles again on June 18, 2016, for the same symptoms, and Brewer referred Miles for treatment by a physician (*Id.* at 17). Brewer again saw Miles for his chronic pain symptoms on December 27, 2017, and referred him for treatment by a physician so that his prescriptions could be renewed (*Id.* at 71). Miles stated in his deposition that he understood that Brewer did not have the authority to prescribe any medication (Doc. 78-1 at 210). Miles stated that he had been under the impression that a nurse like Brewer was able to refer him for treatment to the general medical clinic, but that Krebs had sent him a memo indicating only a doctor could make that determination (*Id.* at 214).

Miles filed this action *pro se* in February 2018 (Doc. 1), and he filed an amended *pro se* complaint (Doc. 54) in February 2019. While his amended complaint also made references to Illinois malpractice law, upon screening the Court found that Miles had asserted a claim solely under 42 U.S.C. § 1983, arguing that Defendants violated his rights under the Eighth Amendment by showing deliberate indifference to his serious medical needs (Doc. 53). After Defendants answered the amended complaint (Docs. 56, 57, 66), Santos filed his Motion for Summary Judgment on July 25, 2019 (Doc. 77), and Brewer and Krebs jointly filed their Motion for Summary Judgment on August 30, 2019 (Doc. 82). The Court then recruited counsel to represent Miles and respond to the motions for

summary judgment (*see* Docs. 91, 93, 95). Counsel filed a response to the pending motions on February 3, 2020 (Docs. 110-111).

## LEGAL STANDARD

Summary judgment is only appropriate if the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Spurling v. C & M Fine Pack, Inc.*, 739 F.3d 1055, 1060 (7th Cir. 2014) (*quoting* FED. R. CIV. P. 56(a)). Once the moving party has set forth the basis for summary judgment, the burden then shifts to the nonmoving party who must go beyond mere allegations and offer specific facts showing that there is a genuine issue of fact for trial. FED. R. CIV. P. 56(e); *see Celotex Corp. v. Catrett*, 477 U.S. 317,232-24 (1986). The nonmoving party must offer more than "[c]onclusory allegations, unsupported by specific facts," to establish a genuine issue of material fact. *Payne v. Pauley*, 337 F.3d 767, 773 (7th Cir. 2003) (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)).

In determining whether a genuine issue of fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). A "court may not assess the credibility of witnesses, choose between competing inferences or balance the relative weight of conflicting evidence[.]" *Reid v. Neighborhood Assistance Corp. of America*, 749 F.3d 581, 586 (7th Cir. 2014) (*quoting Abdullahi v. City of Madison*, 423 F.3d 763, 769 (7th Cir. 2005)).

**DISCUSSION**

A.   *Applicable Law*

To succeed on a claim based on deliberate indifference in the context of medical services, an inmate must demonstrate (1) an objectively serious medical need and (2) that the defendants had a subjectively culpable state of mind in acting or failing to act in disregard of that risk. *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011).

A medical need may be deemed serious if it "has been diagnosed by a physician as mandating treatment or . . . is so obvious that even a lay person would perceive the need for a doctor's attention." *Id.* (quoting *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005)). A medical condition "need not be life-threatening to be serious; rather, it could be a condition that would result in further significant injury or unnecessary and wanton infliction of pain if not treated." *Id.* (quoting *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010).

To establish that prison medical staff acted with a subjectively culpable state of mind, an inmate need not show that harm was actually intended, but merely that "defendants knew of a substantial risk of harm to the inmate and disregarded the risk." *Id.* (quoting *Greeno*, 414 F.3d at 653). Medical professionals are entitled to deference when acting in their professional capacities, and inmates face a heavy burden in bringing claims of deliberate indifference against them. *Id.* "A medical professional acting in his professional capacity may be held to have displayed deliberate indifference only if the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually

did not base the decision on such a judgment." *Id.* (quoting *Sain v. Wood*, 512 F.3d 886, 894-95 (7th Cir. 2008)). Merely negligent conduct will not rise to this level—rather, such conduct must reach a level "showing as something approaching a total unconcern for the prisoner's welfare in the face of serious risks." *Rosario v. Brawn*, 670 F.3d 816, 821-822 (7th Cir. 2012) (quoting *Collins v. Seeman*, 462 F.3d 757, 762 (7th Cir. 2006)). Furthermore, the Seventh Circuit has clarified that prison officials who did not have responsibility for an inmate's medical care or were not involved in the procurement of the care in question or were unaware of any issues with the inmate's care cannot incur liability under 42 U.S.C. § 1983. *Vance v. Peters*, 97 F.3d 987, 992 (7th Cir. 1996).

B.   *Discussion*

Here, Miles does not contend that Santos ignored him or left his chronic pain untreated. Rather, Miles argues that Santos's treatment was so flawed and lacking that it amounted to deliberate indifference. This, as the Court has discussed, is a very high bar, and Miles has failed to reach it. Santos clearly made efforts to treat Miles over a prolonged period of time, seeing him on numerous occasions, experimenting with different medications and prescriptions in an attempt to find one that relieved Miles's pain. Miles appears to have four main issues with this treatment: (1) many of the medications proved ineffective in resolving his pain; (2) Santos refused to prescribe sufficient quantities of medication; (3) Santos did not prescribe Ben-Gay on certain occasions; and (4) Santos did not refer Miles to the general medical clinic.

The mere fact that the medications prescribed by Santos did not in many instances relieve Miles's pain does not indicate deliberate indifference—medical practitioners must

attempt to diagnose and treat maladies with the tools that are available to them and are not expected to infallibly provide remedies to all ailments. Here, there is no indication that the courses of treatment prescribed by Santos were contrary to common sense in the medical profession. Similarly, the amounts of medication provided by Santos seem entirely reasonable when justified in conjunction with Miles's Hepatitis C diagnosis by the need to avoid damage to Miles's internal organs.

As to the remaining points regarding Ben-Gay and clinic placement, these appear justified more by economic concerns than medical need. Miles could have purchased Ben-Gay at the prison commissary, and there is no indication that he lacked funds to do so. Similarly, the only apparent difference between clinic treatment and the treatment that Miles received is that Miles had to pay a copay, and again there is no indication that Miles could not afford to pay the copay. Accordingly, the Court must conclude that on none of these points does Santos's conduct appear to have been lacking in any way. Even taking the facts in the light most favorable to Miles, there is no indication that Santos's treatment came anywhere near the threshold required for a showing of deliberate indifference. Summary judgment must be granted to Santos on the deliberate indifference claim.

Having granted summary judgment to Santos, it is a simple matter to conclude that it is warranted for Brewer and Krebs as well. Miles does not contradict their statements that they lacked the authority to prescribe medications or place him in the general medical clinic or that they deferred to Santos's treatment. As they were not responsible for these aspects of his medical care, they cannot incur liability. Furthermore,

as the Court has already concluded that Santos's treatment was reasonable, Brewer and Krebs appear to have acted reasonably in deferring to that treatment.

## CONCLUSION

For the reasons set forth above, the Court **GRANTS** summary judgment to all Defendants and **DISMISSES** this action **with prejudice**. The Clerk of Court is **DIRECTED** to enter judgment accordingly and close this case.

**IT IS SO ORDERED.**

**DATED: November 3, 2020**

s/ Mark A. Beatty
**MARK A. BEATTY**
**United States Magistrate Judge**